# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (KBO) |
| Debtors. | (Jointly Administered) |
| FTX RECOVERY TRUST, | |
| Plaintiff, | |
| -against- | |
| | Adv. Pro. No. 24-50221 (KBO) |
| ALEKSANDR "SASHA" IVANOV, NUMERIS LTD., DLTECH LTD., and JOHN DOES 1-20, | |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT ALEKSANDR "SASHA" IVANOV'S MOTION TO DISMISS FOR LACK
OF PERSONAL JURISDICTION AND FAILURE TO STATE A CLAIM**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 4

I.      The Waves Ecosystem .......................................................................... 4

II.     Defendant Builds Interest in the Waves Ecosystem and Dupes Alameda into
        Investing.................................................................................................. 5

III.    Defendant Defrauds Users of the Waves Ecosystem........................... 7

IV.     Defendant's Fraudulent Scheme Is Uncovered.................................... 8

V.      After Alameda Collapses, Defendant Refuses to Return Alameda's Property................. 10

ARGUMENT ...................................................................................................... 11

I.      THE COMPLAINT ADEQUATELY PLEADS CLAIMS FOR TURNOVER,
        VIOLATION OF THE AUTOMATIC STAY, AND FRAUD. ...................................... 11

        A.      Legal Standard ......................................................................... 11

        B.      The Complaint States a Claim for Turnover of Property Pursuant  to 11 U.S.C.
                § 542....................................................................................... 12

        C.      The Complaint States a Claim for Violation of the Automatic Stay. ................... 14

        D.      The Complaint States a Claim for Fraud. ............................... 15

II.     DEFENDANT IS SUBJECT TO PERSONAL JURISDICTION IN THIS COURT. ..... 22

        A.      Legal Standard ......................................................................... 22

        B.      Defendant's Contacts and Actions Subject Him to Personal Jurisdiction in the
                United States. .......................................................................... 24

        C.      The Exercise of Specific Jurisdiction Is Consistent with Fair Play and
                Substantial Justice.................................................................. 30

III.    IN THE ALTERNATIVE, PLAINTIFF SHOULD BE GRANTED
        JURISDICTIONAL DISCOVERY. ....................................................... 33

CONCLUSION................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adams*,
27 B.R. 582 (D. Del. 1983)....................................................................................29

*Alameda Rsch. Ltd.* v. *Platform Life Scis. Inc.*,
2023 WL 8814216 (Bankr. D. Del. Dec. 20, 2023)...................................................23

*Am. Eagle Outfitters, Inc.* v. *Lyle & Scott Ltd.*,
2007 WL 1202760 (W.D. Pa. Apr. 12, 2007)..........................................................13

*In re Am. Tissue, Inc.*,
2007 WL 4178949 (Bankr. D. Del. Nov. 20, 2007) .................................................12

*In re Am.-CV Station Grp., Inc.*,
660 B.R. 329 (Bankr. S.D. Fla. 2024)....................................................................32

*Angiodynamics, Inc.* v. *Clarion Med. Techs.*,
2019 U.S. Dist. LEXIS 233819 (D. Mass. Sept. 25, 2019) ......................................31

*Asahi Metal Indus. Co.* v. *Superior Ct. of Cal., Solano Cnty.*,
480 U.S. 102 (1987)............................................................................................30

*Basic* v. *Bprotocol Found.*,
2024 WL 4113751 (W.D. Tex. July 31, 2024) .......................................................27

*In re Bernard L. Madoff Inv. Sec. LLC*,
418 B.R. 75 (Bankr. S.D.N.Y. 2009)................................................................32, 33

*Black* v. *Montgomery Cnty.*,
835 F.3d 358 (3d Cir. 2016)............................................................................11, 13

*Bolton* v. *Ford Motor Co.*,
2024 WL 3328522 (D. Del. July 8, 2024) .............................................................17

*Boyle* v. *City of Philadelphia*,
2018 WL 994218 (E.D. Pa. Feb. 20, 2018) ...........................................................11

*In re Bozel S.A.*,
434 B.R. 86 (Bankr. S.D.N.Y. 2010).....................................................................32

*Bristol-Myers Squibb Co.* v. *Superior Ct. of Cal., San Francisco Cnty.*,
582 U.S. 255 (2017)............................................................................................23

*Burger King Corp.* v. *Rudzewicz*,
    471 U.S. 462 (1985)........................................................................................23, 24, 30

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997)..............................................................................16

*Byrd* v. *Aaron's, Inc.*,
    2012 WL 12887728 (W.D. Pa. Feb. 17, 2012) ...................................................27

*Calder* v. *Jones*,
    465 U.S. 783 (1984)........................................................................................24, 27

*Carteret Sav. Bank, FA* v. *Shushan*,
    954 F.2d 141 (3d Cir. 1992)................................................................................30

*Castrol Inc.* v. *Pennzoil Co.*,
    987 F.2d 939 (3d Cir. 1993)...........................................................................20, 21

*City of Chicago* v. *Fulton*,
    592 U.S. 154 (2021)........................................................................................14, 15

*Compagnie des Bauxites de Guinee* v. *L'Union Atlantique S.A. d'Assurances*,
    723 F.2d 357 (3d Cir. 1983)................................................................................33

*In re Crawford*,
    388 B.R. 506 (S.D.N.Y. 2008)............................................................................28

*In re Davis*,
    177 B.R. 907 (B.A.P. 9th Cir. 1995)...................................................................28

*In re Dawson*,
    665 B.R. 796 (Bankr. S.D. Ohio 2025)...............................................................15

*In re DBSI, Inc.*,
    451 B.R. 373 (Bankr. D. Del. 2011) ...................................................................31

*In re Denby-Peterson*,
    941 F.3d 115 (3d Cir. 2019)................................................................................15

*Eurofins Pharma US Holdings* v. *BioAlliance Pharma SA*,
    623 F.3d 147 (3d Cir. 2010)................................................................................33

*In re Extraction Oil & Gas, Inc.*,
    2020 WL 7074142 (Bankr. D. Del. Dec. 3, 2020)..............................................14

*Finjan LLC* v. *Trustwave Holdings, Inc.*,
    2021 WL 5051147 (D. Del. Oct. 29, 2021) .........................................................23

*In re Firestar Diamond, Inc.*,
    654 B.R. 836 (Bankr. S.D.N.Y. 2023) .................................................................32

*In re Galena Biopharma, Inc. Sec. Litig.*,
    117 F. Supp. 3d 1145 (D. Or. 2015) ....................................................................20

*Gambone* v. *Lite Rock Drywall*,
    288 F. App'x 9 (3d Cir. 2008) ............................................................................29

*Gilliland* v. *Hurley*,
    2010 WL 830968 (W.D. Pa. Mar. 4, 2010) .......................................................34

*In re Glob. Link Telecom Corp.*
    327 B.R. 711, 717 (Bankr. D. Del. 2005) ..........................................................16

*Glob. Network Commc'ns, Inc.* v. *City of New York*,
    458 F.3d 150 (2d Cir. 2006).................................................................................12

*Goodyear Dunlop Tires Operations, S.A.* v. *Brown*,
    564 U.S. 915 (2011)..............................................................................................23

*Grand Ent. Grp., Ltd.* v. *Star Media Sales, Inc.*,
    988 F.2d 476 (3d Cir. 1993).................................................................................30

*Grant St. Grp., Inc.* v. *D & T Ventures, LLC*,
    2012 WL 13689 (W.D. Pa. Jan. 4, 2012).......................................................26, 27

*Hepp* v. *Facebook*,
    14 F.4th 204 (3d Cir. 2021) .................................................................................27

*IMO Indus., Inc.* v. *Kiekert AG*,
    155 F.3d 254 (3d Cir. 1998)............................................................................27, 28

*MacDermid, Inc.* v. *Deiter*,
    702 F.3d 725 (2d Cir. 2012)................................................................................26

*Maugain* v. *FCA US LLC*,
    2023 WL 1796113 (D. Del. Feb. 7, 2023) ..........................................................17

*McGinley* v. *McGinley*,
    252 F. App'x 426 (3d Cir. 2007) .........................................................................29

*In re Medley*,
    2023 WL 1960799 (B.A.P. 9th Cir. Feb. 13, 2023).............................................15

*Mellon Bank PSFS, Nat'l Ass'n* v. *Farino*,
    960 F.2d 1217 (3d Cir. 1992)..............................................................................23

*Merced* v. *Gemstar Grp., Inc.*,
  2011 U.S. Dist. LEXIS 134781 (E.D. Pa. Nov. 22, 2011)......................................................31

*Metcalfe* v. *Renaissance Marine, Inc.*,
  566 F.3d 324 (3d Cir. 2009)......................................................34

*O'Connor* v. *Sandy Lane Hotel Co., Ltd.*,
  496 F.3d 312 (3d Cir. 2007)......................................................30

*Off. Comm. of Unsecured Creditors of Arcapita* v. *Bahrain Islamic Bank*,
  549 B.R. 56 (S.D.N.Y. 2016)......................................................33

*In re OODC, LLC*,
  321 B.R. 128 (Bankr. D. Del. 2005)......................................................16

*ParaFi Digit. Opportunities LP* v. *Egorov*,
  108 Cal. App. 5th 124 (2025)......................................................27

*In re Parker*,
  644 B.R. 805 (N.D. Cal. 2021)......................................................28

*Patin* v. *Thoroughbred Power Boats Inc.*,
  294 F.3d 640 (5th Cir. 2002)......................................................25

*Phila. Contribution Ship Ins. Co.* v. *Neoteric Sols. Inc.*,
  2016 WL 791427 (D.N.J. Feb. 5, 2016)......................................................34

*Philip A. Templeton, M.D., P.A.* v. *EmCare, Inc.*,
  868 F. Supp. 2d 333 (D. Del. June 15, 2012)......................................................12

*Pinker* v. *Roche Holdings Ltd.*,
  292 F.3d 361 (3d Cir. 2002)......................................................23, 25, 31, 33

*In re Pitt Penn Holding Co.*,
  484 B.R. 25 (Bankr. D. Del. 2012)......................................................16

*Polar Electro Oy* v. *Suunto Oy*,
  2017 WL 3713396 (D. Del. Aug. 29, 2017)......................................................24

*Radian Guar. Inc.* v. *Bolen*,
  18 F. Supp. 3d 635 (E.D. Pa. 2014)......................................................25

*Renner* v. *Lanard Toys Ltd.*,
  33 F.3d 277 (3d Cir. 1994)......................................................4

*Ruffing* v. *Wipro Ltd.*,
  529 F. Supp. 3d 359 (E.D. Pa. 2021)......................................................24

*S.E.C.* v. *Lucent Techs., Inc.*,
    363 F. Supp. 2d 708 (D.N.J. 2005) ............................................................20

*Safex Found., Inc.* v. *SafeLaunch Ventures Ltd.*,
    694 F. Supp. 3d 1 (D.D.C. 2023) ...............................................................27

*Sarcuni* v. *bZx DAO*,
    664 F. Supp. 3d 1100 (S.D. Cal. 2023)......................................................27

*Sheehan* v. *Breccia Unlimited Co.*
    2021 WL 4355363 (N.D. Ill. Sept. 24, 2021) ............................................28

*SoftwareArt Corp.* v. *Gopalakrishnan*,
    2008 WL 2876395 (D.N.J. July 22, 2008)...................................................34

*State Farm Mut., Auto. Ins. Co.* v. *Tz'doko V'Chesed of Klausenberg*,
    543 F. Supp. 2d 424 (E.D. Pa. 2008) .........................................................29

*In re Student Fin. Corp.*,
    335 B.R. 539 (D. Del. 2005).......................................................................12

*In re Teknek, LLC*,
    354 B.R. 181 (Bankr. N.D. Ill. 2006) .........................................................32

*Thompson* v. *Gen. Motors Acceptance Corp., LLC*,
    566 F.3d 699 (7th Cir. 2009) .....................................................................14

*Time Share Vacation Club* v. *Atl. Resorts, Ltd.*,
    735 F.2d 61 (3d Cir. 1984).........................................................................23

*Toys "R" Us, Inc.* v. *Step Two, S.A.*,
    318 F.3d 446 (3d Cir. 2003)...................................................22, 23, 24, 33

*In re UD Dissolution Corp.*,
    629 B.R. 11 (Bankr. D. Del. 2021) .......................................................31, 33

*World-Wide Volkswagen Corp.* v. *Woodson*,
    444 U.S. 286 (1980)...............................................................24, 30, 31

*Xanadoo, LLC* v. *Hane*,
    2008 WL 11515874 (E.D. Pa. May 5, 2008) ..............................................27

**Foreign Cases**

*Barnsley v Noble*
    [2014] EWHC 2657 (Ch).............................................................................21

*Easterbrook v Hopkins*
    [1918] NZLR 428 ...................................................................................20, 21

*ECO3 Capital Limited et al v Ludsin Overseas Limited*
  [2013] EWCA Civ 413 ...............................................................................16

*Fordy v Hardwood*
  [1999] WLUK 709 .....................................................................................20

*Shaftsbury House (Developments) Ltd v Lee*
  [2010] EWHC 1484 (Ch)...........................................................................21

*Vald Nielsen Holding A/S v Baldorino*
  [2019] EWHC 1296 (Comm)................................................................18, 22

**Statutes**

11 U.S.C. § 362(a)(3).............................................................................14, 15

11 U.S.C. § 363 ............................................................................................12

11 U.S.C. § 542 ............................................................................................12

**Other Authorities**

Fed. R. Civ. P. 9 ...............................................................................3, 16, 17

Fed. R. Civ. P. 12(b)(2)...............................................................................22

Fed. R. Civ. P. 12(b)(6).......................................................................3, 11, 12, 24

## INTRODUCTION

In the spring of 2022, defendant Aleksandr "Sasha" Ivanov ("Defendant") used his "Waves ecosystem"—a group of products and services operating on the eponymous "Waves blockchain"—to perpetrate a massive fraud. Using a series of misrepresentations and manipulations, Defendant artificially inflated the price of the WAVES cryptocurrency token and siphoned off profits for himself. Unaware of Defendant's scheme, and relying on his misrepresentations about his products and services, debtor Alameda Research Ltd. ("Alameda") deposited over $80 million to Vires.Finance ("Vires" or the "Vires protocol"), a lending platform operating on the Waves blockchain. As the fraudulent scheme began to be uncovered, WAVES lost substantial market capitalization—losing over 95% of its value—ultimately leaving Vires users saddled with $530 million in losses.

Publicly, Defendant tried to blame Alameda for the losses caused by his fraudulent scheme. Privately, Defendant attempted to blackmail Alameda into helping him to perpetuate his fraud—demanding that Alameda make public statements in support of the Waves ecosystem and its products, or he would cause Alameda's assets in the lending protocol to be frozen. And when Alameda and its affiliates collapsed in November 2022, Defendant sought to capitalize on Alameda's insolvency to boost his own failing public image (on which the entire fraudulent scheme relied): he announced (and thereafter enacted) a proposal that blocked Alameda's access to its assets and invited "the incoming liquidators" to contact him to unfreeze Alameda's assets. But when Alameda did contact him, Defendant confirmed that his promises were illusory, refusing to cooperate and ultimately ignoring Alameda's attempts to recover assets. For well over two years now, Defendant has withheld Plaintiff's assets, refusing to return funds that he has publicly acknowledged belong to Plaintiff and its creditors.

In his motion to dismiss, Defendant attempts to avoid responsibility for his misconduct by making a series of "fact"-based arguments that ignore, or attempt to dispute, the allegations of the Complaint. Defendant even attempts to deny that he is subject to jurisdiction in the United States, despite his numerous business connections here and the deliberate steps he took to harm Alameda even *after* it had filed for Chapter 11 protection in this Court. This Court should deny Defendant's motion for the following reasons.

*First*, although Defendant attempts to argue—based on "facts" nowhere alleged in the Complaint—that he does not have possession, custody, or control over Plaintiff's assets that are frozen on Vires and subject to turnover, Defendant has made multiple public statements to the contrary. Following Alameda's bankruptcy petition, Defendant publicly proclaimed that Plaintiff had "$90,359,718.855452" that "may actually be FTX user funds" "held" on Vires, and then proposed and effectuated a governance proposal freezing those assets until he was contacted by the bankruptcy estate, at which point he would turn over the assets. But once contacted, Defendant did not relinquish control over the assets or unblock Plaintiff's access to its assets.

*Second*, although Defendant contends that he did not violate the automatic stay because he took no affirmative steps to deprive Plaintiff of its assets after the filing of the Chapter 11 cases, this argument again disregards Plaintiff's well-pled allegations. The Complaint alleges that, surrounding the collapse of Alameda and its affiliates, Defendant—actively and of his own volition—announced, initiated, and caused to be passed a proposal whereby Plaintiff's access to its assets was affirmatively blocked. By taking affirmative steps to prevent Plaintiff from accessing estate property post-petition, Defendant disrupted the status quo in violation of the automatic stay.

*Third*, far from failing to plead fraud adequately, the Complaint is replete with overt statements Defendant made that misrepresented the profitability and usability of the Waves ecosystem and products, and misled users as to the true nature of Defendant's products.  The Complaint further describes in painstaking detail how Defendant leveraged these statements to perpetrate a massive fraud, making off with hundreds of millions of dollars, which he attempted to cover up with still more lies and extortion.  And contrary to Defendant's argument, Defendant's statements are not inactionable "puffery" or forward-looking statements.  The opposite is true— as alleged in the Complaint, Defendant knew that his statements were false when he made them, and he made the statements for the very purpose of tricking Alameda and others into trusting Defendant's suite of products with their assets.  This is more than enough to plead fraud under Federal Rules of Civil Procedure 12(b)(6) and 9(b).

*Fourth*, Defendant cannot escape this Court's exercise of personal jurisdiction over him by omitting crucial facts about his extensive connections with the United States.  In arguing that the "only reason we are here is because Alameda has an affiliate that filed for bankruptcy in this District," Mot. at 2, Defendant wholly ignores his use of a U.S.-based entity and U.S.-based employees to perpetrate the fraudulent scheme that harmed Plaintiff, as well as his engagement of U.S.-based service providers to maintain and operate the very platforms at the center of the scheme.  Indeed, Defendant has openly admitted that the entire Waves ecosystem relied on the success of his U.S.-based entity.  Moreover, Defendant asks this Court to turn a blind eye to his multiple statements and actions *after the petition date* that were designed to affect estate property that is subject to proceedings in this forum.

Given Defendant's numerous contacts with the United States that Plaintiff already has identified, this Court clearly may exercise personal jurisdiction over Defendant.  But at the

very least, Plaintiff's case should not be dismissed for lack of personal jurisdiction until Plaintiff

has had an opportunity to test Defendant's arguments through jurisdictional discovery.  *Renner* v.

*Lanard Toys Ltd.*, 33 F.3d 277, 283-84 (3d Cir. 1994) (jurisdictional discovery should be "freely

permitted" when record may be "ambiguous" as to whether defendant has exhibited purposeful

availment of forum state).

## STATEMENT OF FACTS

### I.  The Waves Ecosystem

Defendant is the founder of the "Waves ecosystem," a series of products and

services operating on the so-called "Waves blockchain."  Compl. ¶¶ 26-27.  Defendant envisioned

the Waves ecosystem as a single "company, with different products, with synergy between them,"

Dunne Decl. Ex. 1, and he managed the ecosystem using a web of entities that he owned and

controlled, including Numeris Ltd. and DLTech Ltd.  Compl. ¶¶ 21-23.

The Waves ecosystem included two cryptocurrency tokens:  the "WAVES" token

and the "USDN" token.  *Id*. ¶ 27.  The WAVES token is the native cryptocurrency token of the

"Waves Exchange," a decentralized cryptocurrency exchange owned and operated by Defendant.

*Id.* ¶ 3.  The USDN token is an "algorithmic stablecoin product" that was intended to be pegged

to the U.S. dollar, but USDN was backed by the WAVES token and was therefore susceptible to

depegging from the U.S. dollar if the WAVES token declined in value.  *Id.* ¶ 27.

Defendant also operated a liquidity platform and lending protocol for the Waves

ecosystem called Vires.  *Id.* ¶¶ 4, 28.  Users of the Vires protocol could lend digital assets—mostly

USDN tokens—in exchange for interest.  *Id.* ¶ 28.  Users could also borrow digital assets—mostly

WAVES tokens—by posting collateral like dollar-backed stablecoins such as USDC or USDT.

*See id*.  Vires users also ostensibly acquired governance rights in the Vires decentralized

autonomous organization ("Vires DAO").  *Id.* ¶ 4.  But while Defendant held out the Vires DAO

as an independent body through which users could propose and/or vote on governance proposals affecting the Vires protocol, the purportedly "decentralized" and "autonomous" organization was, in fact, controlled by Defendant.  *Id.* ¶¶ 4, 28.

## II.    Defendant Builds Interest in the Waves Ecosystem and Dupes Alameda into Investing.

To market Waves, Defendant publicly touted the profitability of his products on the Waves ecosystem and the independence of Vires' governance.  On September 22, 2021, Defendant tweeted that "#waves wants your liquidity, really thirsty for it :) vires.finance APY's for stable coins are 30-70% now!"  *See id.* ¶ 28 (citing Dunne Decl. Ex. 2).

To improve Waves' competitive position in the blockchain market, Defendant began a push in late 2021 to embrace the United States.  On October 8, 2021, Defendant tweeted that the "#Waves ecosystem [was] starting to conquer the US!"  Dunne Decl. Ex. 3.  Following that tweet, on November 9, 2021, Defendant caused the formation of Corbital LLC in Delaware ("Corbital," at various times doing business as "Waves Labs").  Dunne Decl. Ex. 4.  Defendant viewed Waves Labs as integral for the expansion of the Waves ecosystem.  Dunne Decl. Ex. 5 ("#WavesLabs is the #waves GROWTH ENGINE").  Through Waves Labs, Defendant hired U.S. persons to develop business for, and market, the Waves ecosystem.

Defendant later reflected on the importance of developing connections with the United States:  "[T]he American market [was] the most important crypto market," as it had "a lot of liquidity" and "people [we]re crazy about crypto in the U.S."[1]  Waves Labs remained "a key component of the Waves plan to grow exponentially in 2022," Dunne Decl. Ex. 6, and had as its "primary goal above everything" the "mass adoption of Waves (the blockchain) and all the projects

---

[1]    Waves Tech, *Waves Labs New Hire AMA – Head of Ecosystem, Coleman Maher* at 09:15-10:10 (Apr. 7, 2022), https://www.youtube.com/watch?v=aJDp4t1xx9g.

building on it." Dunne Decl. Ex. 7.  By "[c]reating educational content and campaigns to help users and developers understand what they can do with Waves" and "[h]aving a big presence at all the tech and crypto events," Waves Labs could further the "mass adoption" of the Waves ecosystem.  *Id.*

On February 10, 2022, the Waves X (formerly Twitter) account (1) revealed that "Waves Labs" (*i.e.*, Corbital)—which would "support rapid growth across the [Waves] ecosystem"—was "now headquartered in Miami," (2) announced $150 million in funding for its U.S. operations, and (3) proclaimed that "[t]he US is a key market to drive mass adoption in 2022." Dunne Decl. Ex. 8.  Defendant's Waves ecosystem further cultivated U.S. ties by enacting "an aggressive hiring and marketing plan" via Waves Labs and bringing on U.S.-based employees such as Coleman Maher (the "Head of Ecosystem" and a U.S. citizen and resident) and Aleksandr Rubin (the "Head of U.S. [O]perations," who upon information and belief is a U.S. resident) to lead the promotion of the Waves ecosystem.  *See* Dunne Decl. Exs. 6, 9, 10.  Also on February 10, 2022, Defendant promulgated new Terms of Use for Vires (the "February 2022 Terms of Use"), which claimed that Vires was "fully decentralized" and "managed by a decentralized community." Compl. ¶ 28 (citing Dunne Decl. Ex. 11).

Between February 27 and March 11, 2022, the value of WAVES tokens jumped by more than 170%.  Dunne Decl. Ex. 12.  Defendant publicly attributed the growth to (i) "the US company we launched recently" (*i.e.*, Corbital), Dunne Decl. Ex. 13, operating in "the most important crypto market"[2] (*i.e.*, the United States); and (ii) the increase in assets held on the Waves blockchain, which depended on new users joining Vires, depositing assets, and posting collateral to the Vires protocol.  *See* Dunne Decl. Exs. 13-14.

---

[2]      Waves Tech, *supra* note 1, at 09:34-09:39.

On March 5, 2022, lured by the apparent success of the Waves ecosystem and Defendant's representations about Vires, including its decentralized nature and high yields, Alameda deposited $40.5 million in USDC and USDT on the Vires protocol.  Compl. ¶ 30.  On March 9, 2022, Defendant tweeted that Vires and the Waves Exchange were "crazy profitable . . . much more CONSISTENTLY profitable than anything you have on other chains," and urged investors to "[j]ump in before the imminent influx of thousands of new users."  *See id.* ¶ 29; Dunne Decl. Ex. 15.  Following that tweet, Alameda deposited an additional $19.4 million in USDC and USDT on March 11, 2022, and another $20 million in USDC and USDT on March 12, 2022. Compl. ¶ 30.  Between March 19 and April 1, 2022, Alameda used these deposits as collateral to borrow 630,000 WAVES tokens (then valued at approximately $22 million) on the Waves Exchange, which Alameda, in its capacity as a market-maker and liquidity provider, used to provide liquidity to traders of WAVES tokens on other exchanges.  *Id.* ¶ 31.

## III.    Defendant Defrauds Users of the Waves Ecosystem.

By the time Alameda had deposited over $80 million on the Vires protocol, Defendant had—for months—been operating a fraudulent scheme to exploit his control over the Waves ecosystem for personal gain.  Between January and March 2022, Defendant engaged in a fraudulent "looping" mechanism that ultimately drained Vires of approximately $530 million in user assets.  *Id.* ¶ 33.  Through this scheme, Defendant (1) converted WAVES tokens to USDN, (2) deposited the USDN on Vires to be used as collateral to borrow dollar-backed stablecoins (*e.g.*, USDC and USDT) from Vires users, (3) used the borrowed stablecoin to purchase large amounts of WAVES tokens on a third-party cryptocurrency exchange (which artificially inflated the price of WAVES tokens), and (4) sold a portion of the WAVES tokens at an inflated price, and utilized the remaining WAVES tokens to purchase more USDN and restart the "loop."  *Id.*

The success of this scheme depended on investors being falsely encouraged by the apparently rising value of the WAVES token, which Defendant attributed publicly to Corbital. Vires lenders provided U.S.-dollar backed stablecoins in exchange for USDN tokens, which derived their value from WAVES tokens. So long as the value of USDN tokens (and the WAVES tokens by which they were collateralized) remained stable and roughly pegged to the U.S. dollar, Vires lenders would feel confident that the assets they had loaned to Vires would be repaid. *See id.* ¶ 35. If, however, the price of the USDN tokens and the WAVES tokens by which they were collateralized fell, lenders would be left with USDN tokens that were worth less than the stablecoins they had loaned on Vires, leaving them undercollateralized and holding "bad debt." *Id.*

## IV.    Defendant's Fraudulent Scheme Is Uncovered.

By March 31, 2022, Defendant's scheme began to unravel. *Id.* ¶ 36. On that day, a pseudonymous user on X tweeted that "WAVES is the biggest ponzi in crypto" and claimed that Defendant and other affiliates of the Waves ecosystem had "recklessly engineered price spikes by borrowing USDC at 35% to buy its own [WAVES] token" (referring to step 2 of the loop described above) and that the "WAVES [token's] market cap growth is needed to keep the system stable," such that "WAVES [tokens] will eventually crash and USDN [tokens] will break with it." *Id.* (citing Dunne Decl. Ex. 14).

Following widespread circulation of that March 31, 2022 tweet, the price of WAVES tokens began a sharp decline as holders, reacting to the allegations of fraud, began selling their artificially inflated WAVES tokens. *Id.* ¶¶ 36-37. On April 3, 2022, Defendant attempted to deflect responsibility by blaming Alameda for "manipulat[ing] [the] $waves price and organiz[ing] FUD ['Fear, Uncertainty, and Doubt'] campaigns to trigger panic selling." *Id.* ¶ 7 (quoting Dunne Decl. Ex. 13). That same day, Defendant submitted a governance proposal to the Vires DAO purportedly to prevent further price manipulation, though the proposal was generally considered

"an attempt to target Alameda's funds." Dunne Decl. Ex. 16. The proposal would have reduced the liquidation threshold for WAVES and USDN token borrowing to 0.1%. Any investor that had borrowed WAVES or USDN tokens on Vires would have their collateral automatically liquidated (*i.e.*, seized and sold) to recover the value of their loan if the value of their WAVES or USDN position dropped by 0.1%. Alameda, which had borrowed approximately 630,000 WAVES tokens with approximately $80 million collateral at the time, was forced to return (or purchase) 630,000 WAVES tokens, then worth around $30 million, to avoid having its collateral liquidated. Compl. ¶¶ 31, 38-40.

At the same time, Defendant sought to leverage the threatened governance proposal to extort Alameda into publicly supporting the Waves ecosystem. *Id.* ¶¶ 42-46. On April 4, 2022, in a Telegram chat between Alameda and Waves employees, Maher communicated a proposal to "unwind the situation." *Id.* ¶ 43 (citing Dunne Decl. Ex. 17). Maher suggested, "Let's have FTX list USDN and we can sell you USDN," and in exchange Defendant could "vote against or let the Vires DAO proposal die." *Id.*

On April 8, 2022, to stave off the threat of having its ~$80 million in collateral liquidated, Alameda purchased 634,000 WAVES tokens on the open market, which it then used to repay its outstanding WAVES loan (plus interest). *Id.* After repaying its loan, Alameda did not make any further trades on the Waves Exchange. *Id.*

Between April and August 2022, Defendant used his control of the Vires DAO to enact other governance proposals designed to harm Alameda and coerce it to support the Waves ecosystem. Specifically, Defendant caused a $1,000-per-day withdrawal limit to be enacted on the Vires protocol, which effectively foreclosed Alameda from withdrawing its assets from the Vires protocol. *Id.* ¶¶ 47-50. In October 2022, a senior Waves employee privately requested in

text messages with Ellison that Alameda "publicly show[] support" for Waves, and that, in exchange, the "Vires DAO can release Alameda's vested USDN + an additional bonus." *See id.* ¶ 54. Alameda declined to do so.

**V.      After Alameda Collapses, Defendant Refuses to Return Alameda's Property.**

On November 11 and 14, 2022 (as applicable, the "Petition Date"), Alameda and its affiliates (the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware. *Id.* ¶ 59. In an effort to exploit the Debtors' collapse and improve his tarnished public image, Defendant published a statement on *Medium* on November 14, 2022, in which he admitted that Alameda "currently has $90,359,718.855452 held in the USDN vesting contract on Vires Finance awaiting repayment"— *i.e.*, Defendant recognized that Alameda's assets, which were temporarily "locked" in a "smart contract," were scheduled to "vest" and thereby be released back to Alameda. Dunne Decl. Ex. 17; Compl. ¶ 60 (citing Dunne Decl. Ex. 17). Defendant claimed he would direct (through the Vires DAO under his control) that those funds be blocked "until such a time as the incoming liquidators are in contact with us, and guarantees can be made that the USDN will go to repaying FTX users affected by this insolvency," Compl. ¶ 61, and addressed "the users of [sic] affected by the insolvency of both FTX and Alameda," by stating that "I and the Waves ecosystem stand[] behind you. We intend to do what we can to help users have their funds returned." Dunne Decl. Ex. 18; Compl. ¶ 9 n.8. Defendant thereby explicitly invited the U.S. "liquidators" of Debtors' bankruptcy estate to contact him regarding the return of property he recognized as Debtors' property, and committed to return the property *provided that* certain "guarantees" were made. Compl. ¶ 61.

Defendant then froze Alameda's assets on the Vires protocol. Following the Debtors' bankruptcy filings, Plaintiff's advisors reached out to Defendant to arrange the return of the Vires assets. *Id.* ¶ 62; Dunne Decl. Ex. 19. Although Defendant initially communicated with

Plaintiff's advisors by email and telephone, Defendant ultimately ceased communications. Compl. ¶¶ 61-62. All the while, Defendant continued making public statements designed to create the illusion of his cooperation with the bankruptcy estate. For example, on February 15, 2023, Defendant claimed that he would not unfreeze Alameda's account because he was "waiting for the bankruptcy trustee." Dunne Decl. Ex. 20. On February 17, 2023, Defendant stated that "Alameda accounts are waiting for [the] bankruptcy trustee, and there's one actually, and there's some interaction, but it's not going to be released anytime soon." Dunne Decl. Ex. 21. On July 21, 2023, Defendant reiterated he did not think "anything [would] happen to [Alameda's locked] funds any time soon." Compl. ¶ 63 (citing Dunne Decl. Ex. 22). In his public statements, Defendant omitted that he had declined to cooperate with Plaintiff's advisors.

## ARGUMENT

## I.   THE COMPLAINT ADEQUATELY PLEADS CLAIMS FOR TURNOVER, VIOLATION OF THE AUTOMATIC STAY, AND FRAUD.

### A.   Legal Standard

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Black* v. *Montgomery Cnty.*, 835 F.3d 358, 364 (3d Cir. 2016). "[W]hen a federal court reviews the sufficiency of a complaint . . . the issue is not whether [the] plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Boyle* v. *City of Philadelphia*, 2018 WL 994218, at \*4 (E.D. Pa. Feb. 20, 2018).

For purposes of Rule 12(b)(6), the Court "look[s] to the complaint and attached exhibits in ruling on a motion to dismiss." *Philip A. Templeton, M.D., P.A.* v. *EmCare, Inc.*, 868 F. Supp. 2d 333, 338 (D. Del. 2012). It is not permissible on a Rule 12(b)(6) motion to rely on

material outside the complaint to "make a finding of fact that controvert[s] the plaintiff's own factual assertions set out in its complaint." *Glob. Network Commc'ns, Inc.* v. *City of New York*, 458 F.3d 150, 156 (2d Cir. 2006); *see also In re Student Fin. Corp.*, 335 B.R. 539, 546 (D. Del. 2005) ("The purpose of a motion to dismiss is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case.").

> **B.    The Complaint States a Claim for Turnover of Property Pursuant to 11 U.S.C. § 542.**

A debtor seeking turnover of property pursuant to 11 U.S.C. § 542 must allege that (1) property of the estate is in the possession, custody, or control of another; (2) that property can be used in accordance with the provisions of 11 U.S.C. § 363; and (3) that property has more than inconsequential value to the debtor's estate. *In re Am. Tissue, Inc.*, 2007 WL 4178949, at *8, *21 (Bankr. D. Del. Nov. 20, 2007). Defendant concedes that the Complaint satisfies the second and third elements but disputes the first element, arguing that "[b]ecause Mr. Ivanov does not have 'possession, custody, or control' over any of Alameda's assets deposited into Vires, Alameda fails to state a claim for turnover." Mot. at 20. The well-pled allegations of the Complaint, however, make clear that property of the estate is within Defendant's possession, custody, or control. Defendant attempts to circumvent this by making fact-bound arguments that contradict the Complaint's allegations. Defendant is wrong as a matter of both fact and law.

Defendant contends that because Plaintiff was able to deposit assets to and withdraw assets from the Vires protocol at various times prior to the Petition Date, Plaintiff is somehow "the only party who has 'possession, custody, and control' over those assets." Mot. at 21. But the fact that at some point in the past Plaintiff may have had the ability to access and withdraw its assets is irrelevant because Defendant has since deprived Plaintiff of that access. *See* Compl. ¶¶ 61-62. The Complaint describes these actions in detail, and even quotes from

Defendant's own public statements admitting that he has possession, custody, and control over

Plaintiff's assets.  In particular, Defendant:

- issued a public statement on November 14, 2022, that he claimed sought to "put to rest questions about the position held by Alameda Research on Vires Finance," and admitted that Plaintiff had "$90,359,718.855452 held in the USDN vesting contract on Vires Finance awaiting repayment," *id.* ¶ 60;

- directed (through the Vires DAO under his control) that those funds be blocked "until such a time as the incoming liquidators are in contact with us, and guarantees can be made that the USDN will go to repaying FTX users affected by this insolvency," *id.* ¶ 61;

- addressed "the users of [sic] affected by the insolvency of both FTX and Alameda" and stated that "I and the Waves ecosystem stands [sic] behind you.  We intend to do what we can to help users have their funds returned," *id.* ¶ 9 n.8 (citing Dunne Decl. Ex. 18); and

- acknowledged post-petition discussions with Plaintiff about the release of Plaintiff's funds, and reiterated in July 2023 that he did not think "anything [would] happen to [Alameda's locked] funds any time soon," *id.* ¶ 63.

Similarly, although Defendant contends that "the Waves blockchain wallet that

Alameda used to transact on Vires was (and still is) the only wallet that could borrow against or

withdraw the deposited collateral," he is simply wrong.  Mot. at 21.  But more importantly for

purposes of this motion, this argument impermissibly disputes the well-pled allegations of the

Complaint.  Compl. ¶¶ 43, 48, 52, 54, 61.

On a motion to dismiss, the Complaint's well-pled allegations must be accepted as

true, with all reasonable inferences drawn in Plaintiff's favor.  *Black*, 835 F.3d at 364; *see also*

*Am. Eagle Outfitters, Inc.* v. *Lyle & Scott Ltd.*, 2007 WL 1202760, at *3 n.4 (W.D. Pa. Apr. 12,

2007) ("Allowing the Defendants to reformulate [Plaintiff]'s causes of action . . . would be

inconsistent with both, (a) the rule that the Plaintiff is the master of its complaint, and (b) the

court's obligation to take [Plaintiff]'s allegations as true and construe facts in its favor.").  That

Defendant was able to prohibit Alameda from accessing its assets *post-petition* demonstrates that

Defendant had control over those assets.  *See Thompson* v. *Gen. Motors Acceptance Corp., LLC*, 566 F.3d 699, 702 (7th Cir. 2009) ("Holding onto an asset, refusing to return it, and otherwise prohibiting a debtor's beneficial use of an asset all fit within this definition [of exercising control], as well as within the commonsense meaning of the word.").

Plaintiff's assets remain on the Vires protocol, as Defendant has publicly and privately stated, and as the Complaint alleges.  Compl. ¶¶ 9, 61 n.51.  Defendant's fact-based arguments cannot serve as the basis for a motion to dismiss pursuant to Rule 12(b)(6).

**C.    The Complaint States a Claim for Violation of the Automatic Stay.**

A violation of the automatic stay pursuant to 11 U.S.C. § 362(a)(3) "requires both (1) a post-petition act; and (2) property of the estate."  *In re Extraction Oil & Gas, Inc.*, 2020 WL 7074142, at *4 (Bankr. D. Del. Dec. 3, 2020).  Defendant contends that the Complaint "does not allege any affirmative post-petition action by [Defendant] through which he obtained possession or control over Alameda's assets on Vires."  Mot. at 22.  But the Complaint clearly alleges that Defendant exercised his control over the Vires DAO *after the Petition Date* to pass a proposal that blocked Plaintiff's assets from vesting, thereby preventing Plaintiff from accessing its funds.  Compl. ¶¶ 60-61.

Defendant attempts to excuse his post-petition conduct by mischaracterizing it as the "mere retention of estate property after the filing of a bankruptcy petition" and not affirmative conduct.  Mot. at 22 (quoting *City of Chicago* v. *Fulton*, 592 U.S. 154, 158 (2021)).  But Defendant's conduct is a far cry from passive "retention of estate property," *id.*, and is precisely the type of "post-petition affirmative act to exercise control over property of the estate" that the Third Circuit has held is a violation of the automatic stay.  *In re Denby-Peterson*, 941 F.3d 115, 125-26 (3d Cir. 2019).  "[O]ne of the automatic stay's primary purposes is to maintain the status quo between the debtor and [his] creditors, thereby affording the parties and the [Bankruptcy]

Court an opportunity to appropriately resolve competing economic interests in an orderly and effective way." *Id.* at 126 (internal quotation marks omitted).

Defendant's reliance on *Fulton*, Mot. at 22, is misplaced. There, the Supreme Court held that the City of Chicago's actions in taking possession of the debtor's property *pre-petition* and then refusing to return the property post-petition did not violate the automatic stay. *Fulton*, 592 U.S. at 157-58. As the Supreme Court explained, 11 U.S.C. § 362(a)(3) "halts any affirmative act that would alter the status quo as of the time of the filing of a bankruptcy petition." *Id.* Here, Defendant's *post-petition* actions, in proposing a governance proposal to freeze Alameda's account and causing the Vires DAO to pass that proposal, were affirmative actions that altered Alameda's ability to control its assets. *See, e.g.*, *In re Dawson*, 665 B.R. 796, 803 (Bankr. S.D. Ohio 2025) (finding that Defendant had "changed the status quo when it took possession of the [property] away from [the Debtor] after the bankruptcy filing and it is that affirmative act of repossession that violated the automatic stay under 11 U.S.C. 362(a)(3)"); *In re Medley*, 2023 WL 1960799, at *6 n.7 (B.A.P. 9th Cir. Feb. 13, 2023) (*Fulton* does not apply to affirmative acts of repossession that occur post-petition), *aff'd*, 2024 WL 49806 (9th Cir. Jan. 4, 2024).

**D.      The Complaint States a Claim for Fraud.**

To state a claim for fraudulent misrepresentation under British Virgin Islands ("BVI") law, Plaintiff must allege that:[3]

> (1) the defendant must have made a representation; (2) that representation must have been false; (3) the defendant must have known that the representation was false or must at least have been reckless as to its truth or falsity; (4) the defendant must have intended that the representation would induce the plaintiff to act or refrain from acting (this is sometimes described as an 'intention to deceive'); and (5) the plaintiff was in fact induced by the representation to act or refrain from acting and in consequence suffered a loss.

---

[3]      Count IV of the Complaint was brought pursuant to BVI law and Defendant does not contest the application of BVI law for the purposes of this motion.

Wilson Decl. ¶ 5 (citing *ECO3 Capital Limited et al. v Ludsin Overseas Limited* [2013] EWCA Civ 413 at [77]).[4]  Although Federal Rule of Civil Procedure 9 requires a plaintiff to state "with particularity the circumstances constituting fraud or mistake,"[5] "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418 ("state of mind may be averred generally" provided that plaintiffs "allege facts that show the court their basis for inferring that the defendants acted with 'scienter'").  "To state a claim for fraud, . . . all the plaintiff need[s] [to] do is inform the defendant of the particular conduct which is alleged to have been fraudulent."  *In re OODC, LLC*, 321 B.R. 128, 140 (Bankr. D. Del. 2005).

Defendant challenges Plaintiff's pleading of only three of these elements, arguing that the Complaint does not plead (i) the existence of any false representations, (ii) that Defendant had the requisite mental state, or (iii) that Defendant's false statements induced Alameda to deposit assets on Vires.  Mot. at 27.  Defendant further argues that, to the extent that Plaintiff does identify particular false statements, those statements constitute inactionable forward-looking statements, or mere "puffery."  *Id.* at 27-28.  Defendant is wrong in all respects.

---

[4]    At this time, Plaintiff is not contesting dismissal of Count Three of the Complaint for common law conversion under British Virgin Islands law.  Plaintiff respectfully requests that the Court dismiss Count Three without prejudice to Plaintiff's ability to later seek leave to amend the Complaint should discovery reveal that Plaintiff has a viable claim for conversion.

[5]    The particularity rule is "relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control," *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997), including in the bankruptcy context.  *See In re Pitt Penn Holding Co.*, 484 B.R. 25, 36 (Bankr. D. Del. 2012) (quoting *In re Glob. Link Telecom Corp.*, 327 B.R. 711, 717 (Bankr. D. Del. 2005)) (upholding fraud claims and noting that "in a bankruptcy action, 'greater liberality should be afforded in the pleading of fraud'").

1.    **The Complaint Identifies Numerous Misrepresentations by Defendant.**

The Complaint clearly identifies Defendant's misstatements and omissions.[6] *First*, Defendant repeatedly "misrepresented the profitability" of the Vires platform, Compl. ¶ 83, including through at least two statements directly attributable to him:  (1) Defendant tweeted on September 22, 2021, that "vires.finance APY's for stable coins are 30-70% now!" Dunne Decl. Ex. 2; *see* Compl. ¶ 28 (quoting Dunne Decl. Ex. 2); and (2) Defendant tweeted on March 9, 2022 that the Vires protocol and Waves Exchange were "crazy profitable" and that investors should "jump in before the imminent influx of thousands of new users," Dunne Decl. Ex. 15; *see* Compl. ¶ 29 (quoting Dunne Decl. Ex. 15).  As the Complaint makes clear, Defendant knew that these statements were untrue because, when he made them, he was attempting to artificially inflate the value of WAVES tokens and, by extension, prop up the profitability of the Vires protocol and Waves Exchange.  Compl. ¶ 6.

*Second*, "Ivanov . . . misrepresented the extent to which Vires was a decentralized protocol." *Id.* ¶¶ 28, 83.  In his February 2022 Terms of Use, Defendant stated that Vires was "fully decentralized" and "managed by a decentralized community." *Id.* ¶ 28 (quoting Dunne Decl. Ex. 11).  In reality, as discussed in the Complaint, Defendant "controlled the Vires DAO and decided what governance proposals [it] would and would not pass," *id.* ¶¶ 8, 9, 28, 43, 48, 52, 61, 83, as evidenced by numerous promises Defendant and his agents made to control the outcome of Vires' governance proposals.  *See id.* ¶¶ 43 (promising to "vote against or let the Vires DAO proposal die"), ¶ 54 (stating that "Vires DAO can release Alameda's vested USDN + an additional

---

[6]    Rule 9(b)'s pleading standard "is relaxed for fraudulent omissions."  *Bolton* v. *Ford Motor Co.*, 2024 WL 3328522, at *9 (D. Del. July 8, 2024).   Where defendant's omissions give rise to the fraudulent misrepresentation, plaintiff must show only "(1) that the fact at issue was basic to the transaction, (2) a legitimate reason to rely on the entity that failed to disclose, and (3) that [Plaintiff] could not have discovered the issue."  *Maugain* v. *FCA US LLC*, 2023 WL 1796113, at *6 (D. Del. Feb. 7, 2023) (cleaned up).

bonus" and "Vires DAO will distribute locked & staked USDN to all other USDN vesters" if Alameda agreed to Defendant's demands).[7]

      *Third*, Defendant's argument that the Complaint fails adequately to allege that Defendant misrepresented that users of his protocol could withdraw their assets strains credulity. Defendant marketed the Waves ecosystem as "a decentralized cryptocurrency exchange called 'Waves Exchange,'" not an illiquid investment vehicle in which users' funds were held indefinitely.  Compl. ¶ 3.  Defendant's false public statements following the collapse of his fraudulent scheme that (i) the restrictions on withdrawals that he imposed in April 2022 were "necessary to prevent 'bots' from draining all of the protocol's liquidity, and that 96.5% of users would be able to withdraw their funds within 10 days" and (ii) the limits were temporary and would be removed "'[a]s the system starts working again'" would have been unnecessary (and indeed nonsensical) unless users understood that they could withdraw their assets.  *Id.* ¶ 49. Defendant cannot seriously contend that the Complaint does not put him on notice of the fraud that Plaintiff has alleged.  The Complaint more than satisfies Rule 9's pleading standard.[8]

---

[7]     Defendant does not dispute that statements made in the February 2022 Terms of Use are attributable to him. Mot. at 28-30; *see also* Compl. ¶¶ 3, 8, 28.  Defendant's contention that the February 2022 Terms of Use permitted Defendant indefinitely to prevent users from withdrawing their assets for any purpose is particularly egregious.  As set forth in the Complaint, the February 2022 Terms of Use stated that Vires was "fully decentralized and managed by a decentralized community," Compl. ¶ 28, which was false because Defendant controlled the "community" and every decision it made.

[8]     Defendant suggests (but does not develop an argument) that Plaintiff does not plead reliance on Defendant's misrepresentations.  Mot. at 30.  But the Complaint expressly alleges that Plaintiff made multiple deposits of assets on Vires "in reliance on Ivanov's representations."  Compl. ¶ 30.  Moreover, under BVI law, where a fraudulent misrepresentation has been made, it is presumed the representee will have been induced either to act or not act, and it is Defendant's burden to rebut that presumption.  Wilson Decl. ¶ 6 (citing *Vald Nielsen Holding A/S v Baldorino* [2019] EWHC 1296 (Comm), at [153]).

> ### 2.    The Complaint Adequately Alleges That Defendant Knew His Representations Were False.

The Complaint alleges that Defendant knew his statements about the Waves ecosystem were false at the time they were made.  The Complaint goes on to reference specific conduct and statements by Defendant that indicate Defendant was operating a fraudulent scheme to artificially inflate the value of WAVES tokens and thereby misrepresent the true profitability of the Waves ecosystem:

- "While Ivanov marketed Waves and Vires as opportunities for lenders and other users to make substantial profits, Ivanov secretly orchestrated a series of transactions that inflated artificially the value of WAVES, while at the same time siphoning funds from Vires."  Compl. ¶ 6;

- "On March 31, 2022, market observers began publicizing allegations that Waves was effectively a Ponzi scheme, claiming that Ivanov and others associated with Waves had 'recklessly engineered price spikes by borrowing USDC at 35% to buy its own token.'" *Id.* ¶ 6, 36, 39; *see id.* ¶ 36 n.25 (citing evidence suggesting that to "enrich[] himself," Defendant "orchestrat[ed] a series of transactions" using user assets deposited on Vires "that inflated artificially the value of WAVES, while at the same time siphoning funds").

- "Although Ivanov had repeatedly sought to divert blame to Alameda, subsequent investigations and reporting determined that it was in fact *Ivanov* who had controlled many of the wallets that had engaged in the manipulative 'looping' activity, enriching himself by 'borrowing' increasing amounts of USDC and USDT in exchange for USDN." *Id.* ¶ 39.

The Complaint also includes describes specific statements by Defendant and his agents confirming that Defendant had control over the Vires DAO, notwithstanding their public references to the contrary:

- "Although Ivanov represented that Vires was 'fully decentralized and managed by a decentralized community,' in reality, Ivanov controlled the Vires DAO and decided which governance proposals would or would not pass." *Id.* ¶ 28.

- "A senior Waves employee then presented Alameda with the following proposal: '***We want to unwind the situation***. Let's have FTX list USDN and we can sell you USDN. ***We can vote against or let the Vires DAO proposal die***'. . . . In essence, the 'proposal' demanded that Alameda acquiesce to publicly support Waves, otherwise Ivanov would exercise his control over the Vires DAO to pass the

governance proposals that would result in the liquidation of Alameda's Vires position if Alameda did not promptly repay its WAVES loan." *Id.* ¶ 43 (emphasis in original).

These allegations speak volumes on Defendant's mental state, and are far from "conclusory."

Although no further pleading regarding Defendant's mental state is required, the Complaint goes still further. The Complaint details at length that Defendant's misconduct included attempting to extort Alameda into making false public statements designed to perpetuate his fraud and cover up his own involvement, *id.* ¶¶ 40-47, 54-58, and implementing governance changes to freeze Alameda's assets, *id.* ¶¶ 48-53. These allegations are sufficient to plead scienter. *See S.E.C.* v. *Lucent Techs., Inc.*, 363 F. Supp. 2d 708, 717 (D.N.J. 2005) ("[C]ommon sense dictates that actions taken after the fraud occurred can be circumstantial evidence that the defendant had acted with the requisite state of mind."); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1145, 1166 (D. Or. 2015) (attempts to cover up a fraud support a "strong inference" of scienter). In short, there is no coherent reading of the Complaint to suggest that Defendant acted with anything other than the intent to defraud.

### 3.    Defendant's Statements Are Not Puffery.

Defendant attempts to cast his statements as mere "puffery." Mot. at 28. But Defendant's statements went well beyond what courts consider "mere puff" under BVI law and are actionable fraudulent misrepresentations upon which Plaintiff relied (as Defendant intended).

Under BVI law, a "mere puff" is a statement "so preposterous in its nature that nobody could believe that anyone was misled by it." *Id.* ¶¶ 8-9 (quoting *Easterbrook v Hopkins* [1918] NZLR 428). A "statement favourably describing or extolling goods which by virtue of its vagueness or extravagance would not normally be regarded as something to be taken seriously as grounding any form of liability" because of sufficient "degree or obviousness of its untruth" will be deemed mere puff. *Id.* ¶ 8 (quoting *Fordy* v *Hardwood* [1999] WLUK 709); *accord Castrol*

*Inc.* v. *Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993) ("Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language.").

Defendant's representations were targeted, specific, and not "so preposterous" that investors could not have been misled by the statements. Wilson Decl. ¶ 9. Defendant's statements that the Vires protocol was "crazy profitable,"  and would enable lenders to receive annual percentage yields of between "30 and 70%" on the stablecoin they deposited as collateral, Compl. ¶ 28, when it was in fact a fraudulent scheme that was entirely unprofitable and destined to fail, are precisely the types of statements of fact that properly form the basis for a fraud claim.  *See* Wilson Decl. ¶ 11 (explaining that in *Easterbrook v Hopkins* [1918] NZLR 428, statements that business is "*viable,*" "*a little gold-mine,*" and "*one of the best businesses in town*" were all found to be statements of fact).

Moreover, under BVI law, false statements intended to be relied upon are actionable and cannot be considered puffery.  *Id.* ¶ 12 (citing *Barnsley v Noble* [2014] EWHC 2657 (Ch), at [221]).  Where, as here, one of the primary means of marketing WAVES tokens, USDN tokens, and Vires included social media posts, the statements in those posts should be interpreted as meaningful.  *See id.* ¶ 10 (quoting *Shaftsbury House (Developments) Ltd v Lee* [2010] EWHC 1484 (Ch), at [35], per Proudman J. as explaining that "the expression 'puffery' does not include communications which the recipient is expected to take seriously").  Relatedly, under BVI law, statements cannot be considered puffery when the speaker knows them to be false. *Id.* ¶ 12 ("[W]here it is shown that the defendant had a fraudulent intention, . . . the representation cannot consistently be described as a 'mere puff', because by definition in such a case the defendant did intend that the statement should be taken seriously and indeed that it should be acted upon.").

### 4. Defendant's Misrepresentations Are Actionable Statements of Existing Fact.

Defendant suggests that misstatements are inactionable if they reflect an "intention to do something in the future." Mot. at 27 (citing [Adv. D.I. 17, Ex. H]). But this argument mischaracterizes BVI law. BVI law does not treat projections—the equivalent of what might be "forward looking statements" in U.S. law—as inactionable, as Defendant suggests. Where, as here, a speaker makes a projection that he does not actually expect to come to pass, the statement is a fraudulent misrepresentation. Wilson Decl. ¶¶ 17-20 (citing *Vald Nielsen Holding A/S v Baldorino* [2019] EWHC 1296 (Comm), at [73], [86] (statements regarding profitability of business were actionable)). That is certainly the case here, where Defendant made statements in furtherance of an elaborate fraudulent scheme that he was actively working to perpetrate. *See* Compl. ¶¶ 29, 38.

More importantly, however, the misrepresentations at issue are, in fact, quintessential "representation[s] . . . of existing fact[s]." *Cf.* Mot. at 27. Defendant misrepresented the profitability of the Waves ecosystem *at the time*, and stated that Vires *had enabled* lenders to receive high annual percentage yields and that *it was* "crazy profitable"—not that it might be so in the future. Compl. ¶¶ 28-29. Indeed, Defendant tweeted that the annual percentage yields "are 30-70% *now*." Dunne Decl. Ex. 2 (emphasis added); Compl. ¶ 28 n.18 (quoting Dunne Decl. Ex. 2).

## II. DEFENDANT IS SUBJECT TO PERSONAL JURISDICTION IN THIS COURT.

### A. Legal Standard

"It is well established that in deciding a motion to dismiss for lack of [personal] jurisdiction" under Federal Rule of Civil Procedure 12(b)(2), "a court is required to accept the plaintiff's allegations as true, and is to construe disputed facts in favor of the plaintiff." *Toys "R"*

*Us, Inc.* v. *Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003) (citing *Pinker* v. *Roche Holdings, Inc.*, 292 F.3d 361, 368 (3d Cir. 2002)).  Plaintiff only has the burden of proof "[o]nce the defense has been raised," such that the Court's determination of a motion to dismiss for lack of personal jurisdiction "inherently . . . requires [the] resolution of factual issues outside the pleadings." *Time Share Vacation Club* v. *Atl. Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984); *see also Alameda Rsch. Ltd.* v. *Platform Life Scis. Inc.*, 2023 WL 8814216, at *1 (Bankr. D. Del. Dec. 20, 2023) ("Rule 8 does not require a plaintiff to set forth in the complaint the grounds upon which the court has personal jurisdiction over the defendant . . . .").  A plaintiff may meet its burden by "establishing with reasonable particularity sufficient contacts between the defendant and the forum," *Mellon Bank PSFS, Nat'l Ass'n* v. *Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992), and "in bankruptcy cases, the relevant forum for purposes of personal jurisdiction is the United States in general." *Platform Life Scis. Inc.*, 2023 WL 8814216, at *1.  Plaintiff need only make a *prima facie* showing that personal jurisdiction exists at the motion to dismiss stage. *Finjan LLC* v. *Trustwave Holdings, Inc.*, 2021 WL 5051147, at *4 (D. Del. Oct. 29, 2021).

Courts may exercise either general or specific jurisdiction. *Bristol-Myers Squibb Co.* v. *Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 262 (2017).  Where a defendant is an individual, "the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Goodyear Dunlop Tires Operations, S.A.* v. *Brown*, 564 U.S. 915, 924 (2011).  Specific jurisdiction, meanwhile, ensures that individuals have "fair warning" of the possibility of suit in a given forum while preventing the Due Process Clause from "readily be[ing] wielded as a territorial shield."[9] *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 472, 474 (1985).

---

[9]      Defendant cites *Bristol-Myers Squibb*, 582 U.S. at 263, for the proposition that "the law of specific jurisdiction seeks to ensure that forums with 'little legitimate interest' in a suit do not encroach on forums more affected by the controversy." Mot. at 9.  But *Bristol-Myers Squibb* does not stand for that proposition,

In determining whether specific jurisdiction exists, courts typically apply either the "minimum contacts" test or the "effects" test. *Toys "R" Us, Inc.*, 318 F.3d at 455 n.6. "[M]inimum contacts" require "some act by which the defendant purposefully avails [him]self of the privilege of conducting activities within the forum . . . , thus invoking the benefits and protections of its laws." *Id.* at 451. In other words, courts consider whether the defendant can "reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U.S. 286, 297 (1980). Under the "minimum contacts" test, courts may exercise specific jurisdiction when "the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp.*, 471 U.S. at 472 (citation and internal quotation marks omitted). Alternatively, where a defendant has committed an intentional tort, courts may exercise specific jurisdiction under the "effects" test when the tortious conduct is "calculated to cause injury" in the forum. *Calder* v. *Jones*, 465 U.S. 783, 789, 791 (1984).

### B.    Defendant's Contacts and Actions Subject Him to Personal Jurisdiction in the United States.

As the Waves Head of Community once boasted, the Waves "ecosystem" that Defendant used to perpetrate his Ponzi scheme "obviously [has] a lot of links to America." Dunne Decl. Ex. 23. Defendant agrees that this Court would have jurisdiction over him if he "advertised and marketed in the United States," "hired U.S. employees," or "retained consultants or entered into service agreements or other contracts with U.S. companies." Mot. at 10. Defendant's extensive links to the United States (the very sorts of contacts he enumerates), and Defendant's

---

nor has Defendant identified any other case that supports it. Indeed, "[p]ersonal jurisdiction is not . . . a matter of judicial economy," *Ruffing* v. *Wipro Ltd.*, 529 F. Supp. 3d 359, 368 (E.D. Pa. 2021), and it is a basic principle that "multiple jurisdictions could simultaneously possess personal jurisdiction over the same case in controversy." *Polar Electro Oy* v. *Suunto Oy*, 2017 WL 3713396, at *6 n. 4 (D. Del. Aug. 29, 2017).

conduct directed toward the United States, place him squarely within the jurisdiction of this Court.[10]

### 1.    Defendant Has More than "Minimum Contacts" with the United States.

The maintenance of Defendant's fraudulent scheme required the continued growth of WAVES token's market capitalization, which also depended on Defendant attracting additional Vires protocol investors.  To expand the operations of his ecosystem, Defendant registered a Delaware company—Corbital—in November 2021, Dunne Decl. Ex. 4, and later employed U.S. employees.  By February 10, 2022, Corbital had begun doing business as "Waves Labs" out of Miami, Florida.  Dunne Decl. Ex. 8; *see also* Dunne Decl. Ex. 24.  Between approximately February 27, 2022 and March 11, 2022, the value of the WAVES token jumped by more than 170%.  Dunne Decl. Ex. 12, at 1.  Defendant publicly attributed the growth of WAVES to "the US company we launched recently"—*i.e.*, Corbital d/b/a Waves Labs—and its operations in the U.S. market, which Defendant recognized as "the most important crypto market"[11] due to its liquidity and large investor base.  Dunne Decl. Ex. 13, at 1.  Corbital's application for a certificate to do business as a foreign LLC in Florida solely lists Defendant as a member, with his address in Miami. Dunne Decl. Ex. 10.  Thus, Defendant's efforts to mislead U.S. investors in order to perpetrate the very scheme that harmed Plaintiff involved contacts sufficient to establish personal jurisdiction. *See Pinker*, 292 F.3d at 371-72 (holding that foreign corporation was subject to personal

---

[10]    Defendant does not suggest that the contacts of his companies are not properly attributable to him.  *See*, *e.g.*, Mot. at 17-18 (admitting that an "alleg[ation] . . . that Vires is accessible only in the United States" would amount to an "alleg[ation] that Mr. Ivanov expressly aimed . . . his conduct . . . at the United States") (emphasis removed).  Even if Defendant had disputed the attribution of corporate contacts to him, "federal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual . . . when the individual . . . is an alter ego . . . of a corporation that would be subject to personal jurisdiction in that court."  *Radian Guar. Inc.* v. *Bolen*, 18 F. Supp. 3d 635, 648 (E.D. Pa. 2014) (quoting *Patin* v. *Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002)).

[11]    Waves Tech, *supra* note 1, at 09:34-09:39.

jurisdiction in United States because its purposeful availment of U.S. market meant it "ha[d] adequate notice that it may be haled into an American court for fraudulently manipulating that market").

Moreover, Defendant chose to perpetrate his fraud using websites hosted by U.S. companies on servers located in the United States. The Vires website, for example, is hosted by Vercel Inc.—a U.S. company—on an Amazon, Inc. server in California. Dunne Decl. Exs. 25-26. The Waves Exchange and Waves Labs websites, meanwhile, both engage Cloudflare, Inc., a U.S. information technology service management company, to improve their performance and security. *Id.* Exs. 27-30. Defendant's decision to use these U.S.-based companies and services was not accidental. Defendant is a sophisticated actor who is well-versed in digital technology, and there can be little doubt that he not only knew how his websites functioned, but also configured them that way intentionally. *See MacDermid, Inc.* v. *Deiter*, 702 F.3d 725, 730 (2d Cir. 2012) (finding personal jurisdiction over defendant in part because "[m]ost Internet users, perhaps, have no idea of the location of the servers through which they send their emails," whereas in the case at hand, "[plaintiff] has alleged that [defendant] knew that the email servers she used and the confidential files she misappropriated were both located in Connecticut."). Notably, Defendant appears to have willingly submitted to jurisdiction in the United States in connection with his engagement of these services. Dunne Decl. Exs. 30, 31.

Defendant's deliberate choice to use U.S. companies and web infrastructure to perpetrate his fraud and control Plaintiff's assets, when combined with his other U.S. contacts, is more than sufficient to subject him to jurisdiction here.[12]  *See, e.g., Grant St. Grp., Inc.* v. *D & T*

---

[12]    Given Defendant's substantial contacts with the United States, the cryptocurrency-related cases that Defendant cites, *see* Mot. at 14-15, are inapposite. Plaintiff's allegations concern actions that Defendant took directly, whereas the claims against the individual defendants in the cases cited by Defendant were based

*Ventures, LLC*, 2012 WL 13689, at *4 (W.D. Pa. Jan. 4, 2012) (fact that websites were "hosted on computers located in Florida" was relevant to personal jurisdiction inquiry); *Byrd* v. *Aaron's, Inc.*, 2012 WL 12887728, at *1 (W.D. Pa. Feb. 17, 2012) (denying motion to dismiss for lack of personal jurisdiction over foreign corporation where alleged acts began outside forum but traveled via internet to Pennsylvania-based server operated by co-defendant); *Xanadoo, LLC* v. *Hane*, 2008 WL 11515874, at *1 (E.D. Pa. May 5, 2008) (jurisdiction established where website was "maintained through servers located in Pennsylvania"); *cf. Hepp* v. *Facebook*, 14 F.4th 204, 208 (3d Cir. 2021) (hosting relevant to jurisdictional inquiry).

### 2. The Effects of Defendant's Post-Petition Conduct Further Subject Him to Personal Jurisdiction in the United States.

Courts may exercise specific jurisdiction for "intentional conduct . . . calculated to cause injury" in the forum. *Calder* v. *Jones*, 465 U.S. 783, 791 (1984). In *IMO Indus., Inc.* v. *Kiekert AG*, the Third Circuit held that a defendant may be subject to personal jurisdiction for the "effects" of his intentional conduct when:

> (1) [t]he defendant committed an intentional tort; (2) [t]he plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; [and] (3) [t]he defendant expressly aimed his

---

largely on the actions of their companies, their partners, and unrelated third parties. *See, e.g.*, *Basic* v. *Bprotocol Found.*, 2024 WL 4113751, at *5 (W.D. Tex. July 31, 2024) ("Plaintiffs here make no allegation that any Individual Defendant directed [the corporate entity's] contacts to the forum" and assert only "conclusory" "allegations of control over the Entity Defendants"); *Sarcuni* v. *bZx DAO*, 664 F. Supp. 3d 1100, 1121-22 (S.D. Cal. 2023) (finding that plaintiff had failed to establish that general partner had purposefully availed himself of forum by, without more, asserting that partner had intentionally continued to communicate about partnership business with another general partner who had moved to forum); *ParaFi Digit. Opportunities LP* v. *Egorov*, 108 Cal. App. 5th 124, 145-46 (2025) (internal quotation marks omitted) (finding no personal jurisdiction where defendant had reached out to non-party, who had subsequently placed defendant in contact with plaintiff, as personal jurisdiction could not be established by "unilateral activity of a plaintiff"); *Safex Found., Inc.* v. *SafeLaunch Ventures Ltd.*, 694 F. Supp. 3d 1, 16 (D.D.C. 2023) (finding that "interactive features of [Defendant's] website, without more, [we]re insufficient" to establish personal jurisdiction where both parties had offered evidence that Defendant's website was "off-limits to the United States" and there was not "more evidence that consumers in the United States" had access to the digital products offered by defendant). In any event, as explained *supra* in Part II.B.1, the contacts of Defendant's corporations—several of which he caused to be dissolved—can be attributed to him.

tortious conduct at the forum such that the forum can be said to be
the focal point of the tortious activity.

155 F.3d 254, 265-66 (3d Cir. 1998) (footnote omitted).  All three elements are met with respect

to Defendant's willful violation of the automatic stay.

 *First*, a "willful violation of the automatic stay is an intentional tort."  *In re Davis*,

177 B.R. 907, 911 (B.A.P. 9th Cir. 1995); *see also In re Parker*, 644 B.R. 805, 837 n.30 (N.D.

Cal. 2021) (holding that willful automatic stay violations "are considered intentional torts"), *aff'd*,

2022 WL 15523089 (9th Cir. Oct. 27, 2022); *In re Crawford*, 388 B.R. 506, 522-23 (S.D.N.Y.

2008) (finding agent liable for willful violation of automatic stay because agents are liable for their

own tortious conduct), *aff'd in part, vacated in part on other grounds, remanded on other grounds*,

476 B.R. 83 (S.D.N.Y. 2012).  Defendant relies on *Sheehan* v. *Breccia Unlimited Co.* to suggest

that an automatic stay violation cannot confer jurisdiction.  Mot. at 17 n.19 (citing 2021 WL

4355363, at *5 (N.D. Ill. Sept. 24, 2021)).  *Sheehan*, however, is readily distinguishable.  There,

the court based its holding on the fact that the Irish defendants did nothing to "purposefully reach

out beyond Ireland and affirmatively affiliate themselves with the United States in their dealings"

with the estate property at issue.  2021 WL 4355363, at *5 (internal quotation marks omitted).

That is simply not the case here, where Defendant threatened to freeze the Debtors' assets after

they had filed for bankruptcy in the United States, invited the U.S. "liquidators" to contact him,

demanded "guarantees" regarding the distribution of the property at issue, and froze the assets

when the Debtors did not comply with his demands.

 *Second*, Plaintiff clearly "felt the brunt of the harm" of Defendant's misconduct in

the United States.  That Alameda was incorporated in the BVI and headquartered in the Bahamas

*before* its bankruptcy filing is irrelevant to Plaintiff's claims alleging that Defendant violated the

automatic stay *after* Debtors' Chapter 11 filing in this forum, at which point Alameda's

professional activities—namely, its liquidation proceedings overseen by this Court—were centered in the United States.  Defendant's willful violation of the automatic stay has undermined Plaintiff's professional activities by inhibiting the "orderly liquidation procedure under which all creditors are treated equally."  *In re Adams*, 27 B.R. 582, 583 (D. Del. 1983).  Under these circumstances, there is no colorable argument that Plaintiff suffered the "brunt of the harm" in any forum but this one.[13]

*Third*, Defendant "expressly aimed" his wrongful acts at the United States.  If Defendant did not intend to reach the United States by withholding Plaintiff's assets until the U.S. "liquidators" contacted him and made certain "guarantees" about this Court's distribution of the property at issue, then it is difficult to imagine which forum Defendant intended to reach.  Courts have found defendants in similar contexts to have "expressly aimed" their conduct at the relevant forum.  *See, e.g.*, *Gambone* v. *Lite Rock Drywall*, 288 F. App'x 9, 14 (3d Cir. 2008) (exercise of personal jurisdiction proper because appellant had expressly aimed conduct at forum by intentionally transferring away assets to prevent plaintiffs "from collecting on a judgment rendered in their favor by a court in Pennsylvania"); *State Farm Mut., Auto. Ins. Co.* v. *Tz'doko V'Chesed of Klausenberg*, 543 F. Supp. 2d 424, 431 (E.D. Pa. 2008) (liquidating corporation to avoid paying judgment issued by in-forum court was "expressly aimed" at forum).  Because Defendant committed an intentional tort that primarily harmed Plaintiff in this forum and was "expressly aimed" at this forum, this Court has specific jurisdiction over Defendant.[14]

---

[13]    Contrary to Defendant's claim that "by choosing to bring tort claims . . . under BVI law, [Plaintiff] has acknowledged that the United States has no relationship to this dispute," Mot. at 15, "it is well established that personal jurisdiction and choice of law are distinct issues."  *McGinley* v. *McGinley*, 252 F. App'x 426, 428 (3d Cir. 2007).

[14]    Defendant's actions are, at the very least, additional minimum contacts evidencing his purposeful availment of this forum.  Defendant publicly invited Plaintiff to retrieve its assets—which Defendant then froze.  When Plaintiff did contact him, he interacted with Plaintiff's advisors in the United States including by email and

C.     **The Exercise of Specific Jurisdiction Is Consistent with Fair Play and Substantial Justice.**

"The existence of minimum contacts makes jurisdiction presumptively constitutional," *O'Connor* v. *Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 324 (3d Cir. 2007), at which point the burden shifts to the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Carteret Sav. Bank, FA*, 954 F.2d at 150 (quoting *Burger King Corp.*, 471 U.S. at 477). Specifically, Defendant must show "an absence of fairness or lack of substantial justice," and Defendant's burden "is heavy." *Grand Ent. Grp., Ltd.* v. *Star Media Sales, Inc.*, 988 F.2d 476, 483 (3d Cir. 1993). Defendant relies almost entirely on *Asahi Metal Indus. Co., Ltd.* v. *Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102 (1987)—"the only Supreme Court case ever to present so compelling a situation" as to find that this factor warranted dismissal. *O'Connor*, 496 F.3d at 325. Defendant fails to satisfy that heavy burden.

Defendant is correct that the reasonableness analysis "depends on the Court's assessment of certain factors." Mot. at 12. In particular, it is appropriate to consider (1) "the burden on the defendant," (2) "the [forum]'s interest in adjudicating the dispute," (3) "the plaintiff's interest in obtaining convenient and effective relief," (4) "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and (5 the "shared interest of the several States in furthering fundamental substantive social policies." *World-Wide Volkswagen Corp.*, 444 U.S. at 292. "In the federal court context, the inquiry will be slightly different, taking

---

over the phone. After ceasing contact, Defendant falsely represented that he was merely safeguarding Plaintiff's property in efforts to improve his reputation while at the same time harming the creditors of these Chapter 11 proceedings. Taken together (and considered with the contacts discussed in Part II.B.1 *supra*), there can be no plausible argument that Defendant did not "reasonably anticipate being haled into court" in the United States. *World-Wide Volkswagen Corp.*, 444 U.S. at 297; *see also Carteret Sav. Bank, FA* v. *Shushan*, 954 F.2d 141, 150 (3d Cir. 1992) (aggregating contacts to find specific jurisdiction over defendant), *cert. denied*, 506 U.S. 817 (1992).

less account of federalism concerns, and focusing more on the national interest in furthering the policies of the law(s) under which the plaintiff is suing." *Pinker*, 292 F.3d at 370-71 (citation omitted). Here, it is telling that Defendant cherry-picks three of these factors ("the burden on defendant, the interests of the forum, and the interstate judicial system's interest in efficient resolution of litigation")—none of which actually weigh in Defendant's favor—while ignoring others. Mot. at 12. Indeed, all five factors clearly weigh in Plaintiff's favor.

  *First,* this Court's exercise of personal jurisdiction would not impose a substantial burden on Defendant, who appears to maintain a Florida address (Dunne Decl. Ex. 10) and, by his own admission, currently holds a valid U.S. visa and has traveled to the United States on several occasions. [Adv. D.I. 15 ¶ 7.] It is therefore clear that "travel to this forum . . . is not inconvenient" for Defendant.[15] *In re UD Dissolution Corp.*, 629 B.R. 11, 28 (Bankr. D. Del. 2021); *see also Angiodynamics, Inc.* v. *Clarion Med. Techs.*, 2019 U.S. Dist. LEXIS 233819, at *29 (D. Mass. Sept. 25, 2019) ("[M]odern travel creates no especially ponderous burden for business travelers."). This burden is further diminished by the fact that Defendant "already ha[s] counsel here," *In re UD Dissolution Corp.*, 629 B.R. at 28, and has "failed to prove that he cannot bear the financial burden of litigating in Delaware." *In re DBSI, Inc.*, 451 B.R. 373, 377 (Bankr. D. Del. 2011). Simply put, Defendant "has the means and the money to litigate in the United States."[16] *In re Am.-*

---

[15] Defendant's contention that "Alameda's choice to sue in Delaware is a strategic attempt to put a severe burden on Mr. Ivanov" is nonsensical. Mot. at 12. Plaintiff's Chapter 11 proceedings have been ongoing in this Court since 2022.

[16] In addition, Plaintiff, who was injured by Defendant's actions, should not bear the burden of litigating this adversary proceeding in a foreign judicial system. *See Merced* v. *Gemstar Grp., Inc.*, 2011 U.S. Dist. LEXIS 134781, at *16-17 (E.D. Pa. Nov. 22, 2011) ("Although this Court realizes that litigating in a foreign judicial system imposes unique burdens upon a party, the Court sees no reason why this burden should be borne by the injured Plaintiff . . . .").

*CV Station Grp., Inc.*, 660 B.R. 329, 341 (Bankr. S.D. Fla. 2024), *recons. denied*, 2025 WL 38113 (Bankr. S.D. Fla. Jan. 3, 2025).

       *Second*, "[t]he United States has a strong interest in adjudicating claims that arise under its Bankruptcy Code so that both creditors and debtors can obtain the remedies and relief that the United States Congress has determined are fair and equitable." *In re Firestar Diamond, Inc.*, 654 B.R. 836, 903 (Bankr. S.D.N.Y. 2023). This interest in enforcing the Bankruptcy Code outweighs even a strong interest on the part of a defendant. *In re Bernard L. Madoff Inv. Sec. LLC*, 418 B.R. 75, 81-82 (Bankr. S.D.N.Y. 2009). In part, this is because "[t]he adjustment of the debtor-creditor relationship is a federal concern, and one of the policies underlying the substantive law in this area is the notion that a single federal forum ought to have the power to bring before it all matters with respect to a single bankruptcy debtor so that all such matters may be handled more efficiently, consistently, and expeditiously than if they were scattered throughout various courts." *In re Teknek, LLC*, 354 B.R. 181, 204 (Bankr. N.D. Ill. 2006) (citation omitted). This is particularly true in a complex bankruptcy such as this one, in which debtor entities were incorporated in multiple jurisdictions.

       *Third*, "Plaintiff ha[s] an interest, as a matter of judicial efficiency, in resolving disputes related to the Chapter 11 petition in this forum." *In re Bozel S.A.*, 434 B.R. 86, 101 (Bankr. S.D.N.Y. 2010). Further, it is not clear that Plaintiff would have access to the remedies Congress has deemed appropriate under the Bankruptcy Code if it were forced to litigate this dispute elsewhere, meaning Plaintiff "has a strong interest in obtaining convenient and effective relief" in this forum. *Off. Comm. of Unsecured Creditors of Arcapita* v. *Bahrain Islamic Bank*, 549 B.R. 56, 72 (S.D.N.Y. 2016).

*Fourth*, it is clear that "the most efficient resolution of the controversy would be in the United States," which is the location of Plaintiff's "inextricably-related" bankruptcy, where this case has been pending for years and the Court is well-acquainted with the parties and issues. *In re Bernard L. Madoff Inv. Sec. LLC*, 418 B.R. at 82.

*Fifth*, Plaintiff's claims certainly serve "the national interest in furthering the policies of the law(s) under which the plaintiff is suing," *Pinker*, 292 F.3d at 371, as many claims arise under the United States Bankruptcy Code. And as the judicial systems of the United States and the BVI "are rooted in similar common law traditions," litigating Plaintiff's BVI law claims here would "ensure that the procedural and substantive interests of both nations are not offended." *In re UD Dissolution Corp.*, 629 B.R. at 28.

Because Defendant has not shown that *any* of the relevant factors are satisfied, he has failed to rebut the presumption that the exercise of personal jurisdiction would comport with traditional notions of fair play and substantial justice.

## III.    IN THE ALTERNATIVE, PLAINTIFF SHOULD BE GRANTED JURISDICTIONAL DISCOVERY.

If this Court finds that Plaintiff has not met its burden of establishing a *prima facie* showing of jurisdiction over Defendant, the Court should permit Plaintiff to take jurisdictional discovery. "Where the plaintiff's claim is not clearly frivolous," courts "should ordinarily allow discovery on jurisdiction in order to aid the plaintiff in discharging that burden." *Compagnie des Bauxites de Guinee* v. *L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir. 1983). The Third Circuit has further clarified that the plaintiff is only required to "suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the party] and the forum state.'" *Eurofins Pharma US Holdings* v. *BioAlliance Pharma SA*, 623 F.3d 147, 157 (3d Cir. 2010) (alteration in original) (quoting *Toys "R" Us, Inc.*, 318 F.3d at 455). Contrary to

Defendant's assertions (Mot. at 19), these suggestions need not be made in the Complaint. Where, as here, the possible existence of requisite contacts is suggested with 'reasonable particularity' in an opposition to a motion to dismiss, courts in this circuit have granted jurisdictional discovery. *See Phila. Contribution Ship Ins. Co.* v. *Neoteric Sols. Inc.*, 2016 WL 791427, at *2 (D.N.J. Feb. 5, 2016) (granting jurisdictional discovery where Plaintiff had suggested in opposition to motion to dismiss that Defendant was utilizing U.S. company to perpetuate his business), *report and recommendation adopted sub nom. Phila. Contributionship Ins. Co.* v. *Neoteric Sols. Inc.*, 2016 WL 780570 (D.N.J. Feb. 24, 2016).

Plaintiff has plainly identified numerous contacts Defendant had with the United States, along with supporting evidence, that meet this standard. While it is true that courts "have found jurisdictional discovery particularly appropriate where the defendant is a corporation," *Metcalfe* v. *Renaissance Marine, Inc.*, 566 F.3d 324, 336 (3d Cir. 2009), courts within this Circuit routinely grant jurisdictional discovery when the defendant is a natural person. *See, e.g.*, *SoftwareArt Corp.* v. *Gopalakrishnan*, 2008 WL 2876395, at *3 (D.N.J. July 22, 2008) (awarding jurisdictional discovery because allegations that defendant had contacted forum state via email, phone, and mail were "not frivolous"); *Gilliland* v. *Hurley*, 2010 WL 830968, at *3-4 (W.D. Pa. Mar. 4, 2010) (granting jurisdictional discovery in case with two individual defendants). In any event, Defendant cannot hide behind his status as an individual given that he caused the relevant corporate entities (his alter egos) to be dissolved in 2023. *See* Compl. ¶ 63. The move came six months into Defendant's engagement with the Debtors over Plaintiff's assets, after Defendant had become unresponsive. *Id.* Before its dissolution, Numeris Ltd. had been named as a Defendant in a U.S. lawsuit asserting a claim for fraud. *See Eisenberg* v. *Numeris Ltd.*, No. 3:22-cv-1325 (D.P.R. July 6, 2022) (naming Defendant and Numeris Ltd. as defendants).

## CONCLUSION

For all of the foregoing reasons, the Court should deny Defendant's motion.  If the Court finds that Plaintiff has not met its burden of establishing a *prima facie* showing of personal jurisdiction over Defendant, Plaintiff respectfully requests leave to conduct jurisdictional discovery.  If the Court grants Defendant's motion in whole or in part, Plaintiff respectfully requests leave to replead.

Dated: March 21, 2025
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Richard S. Cobb*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson, IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email:  landis@lrclaw.com
       cobb@lrclaw.com
       mcguire@lrclaw.com
       robertson@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Brian D. Glueckstein (admitted *pro hac vice*)
Stephen Ehrenberg (admitted *pro hac vice*)
Justin J. DeCamp (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
Email:  gluecksteinb@sullcrom.com
       ehrenbergs@sullcrom.com
       decampj@sullcrom.com
       dunnec@sullcrom.com

*Counsel for Plaintiff*